GEORGE W. FRITZ v. THE HOME INSURANCE COMPANY.

*Fire insurance—Occupancy of premises.*

1. The intent of the parties to an insurance policy in respect to occupancy is to be gathered from the usual and ordinary use of the premises for the purposes to which they are devoted. Wood, Ins. 181; *Whitney v. Ins. Co.*, 9 Hun, 37.

2. Where at the time of insuring a farm barn it was occupied by a tenant, who lived on another farm, and used the barn for the storage of produce until sold, of which facts the agent of the company had notice,—the application being a verbal one, and the policy being silent as to occupancy,—the cessation of *such* occupancy by the tenant, after which an agent of the owner of the barn went to the premises frequently to see that the doors were fastened, etc., will not avoid the policy upon the ground that when the policy was issued the premises were occupied in the usual manner by a tenant, and that they became vacant and unoccupied within the meaning of the policy on the cessation of such occupancy.

Error to Allegan. (Arnold, J.) Argued November 1, 1889. Decided December 28, 1889.

*Assumpsit.* Defendant brings error. Affirmed. The facts are stated in the opinion.

*Pope & Hart,* for appellant.

*Joseph Thew (Padgham & Humphrey,* of counsel), for plaintiff.

LONG, J. This action was brought to recover for the loss of a barn by fire. The policy was issued on July 2, 1887, by H. F. Marsh, the local agent of the defendant company. The application was verbal. The principal defense relied upon was that the barn and premises insured were at the time of the fire, and for some three months prior thereto had been, vacant and unoccupied,

without the consent of the company, and contrary to the provisions of the policy.

The evidence tended to show that some time before the policy issued the farm upon which the barn was situate was let by the plaintiff to one George Strayer, for three years, and the plaintiff went to the Upper Peninsula to live. He returned some time in June, 1887, and on July 2 called upon Mr. Marsh, the agent of the company, to insure the barn on the farm. The plaintiff advised Marsh that he was living in the Upper Peninsula; that the farm was rented to Strayer, but that Strayer did not live on it, but lived on the farm of Renick, a short distance away. The plaintiff also advised Marsh that he did not want the old house on the farm insured, because it was worthless, and no one could live in it. Marsh was aware at this time that no one lived on the farm,—that there was no house to live in; and he also knew where the tenant, Strayer, lived, and knew the Renick farm, and the location of the building where Strayer lived, which was more than a half mile from the barn in question. The policy was issued for $450, and delivered to the plaintiff, who soon after went north. Before going, he informed his father-in-law, John King, that Strayer's time expired on January 1, 1888, and requested him to look after the place, and take charge of it for him, and rent it, if he found a good man. Strayer simply worked the farm on which the barn stood, and used the barn to put produce in until it was sold. Occasionally he put farming tools in the barn, when he was there at work, and left them there until he was through using them, and then took them back to the Renick farm, which he was working, and where he kept his stock, team, and tools. He never kept stock or teams at the plaintiff's farm, except when in use there, and only used the barn to store products.

Some time in the fall of 1887, Strayer moved from the Renick farm into the village of Allegan, and left nothing in plaintiff's barn except some oats. He had corn on the farm, which he afterwards husked, and used to go down to the farm occasionally, on Sundays, to look after things generally. About January 1, Strayer took his oats away, and left nothing in the barn, and nothing on the premises except a binder, which stood out doors, and was frozen down so he could not move it. As soon as Strayer had taken his oats away from the barn, King took charge of it; went up to the premises frequently to see to things,— to see that the doors were fastened, etc. This was kept up by him until a day or two previous to the fire.

The fire occurred on March 30, 1888. Plaintiff was not advised of the fire until April 11, following, when he called on Marsh to have the loss adjusted. The company subsequently refused to pay the loss, principally upon the ground that when the policy was issued the premises were occupied, in the usual manner, by a tenant, until January 1, 1888, when the premises became vacant and unoccupied, within the meaning of the policy.

It was contended on the part of the plaintiff that the company had knowledge by its agent, Marsh, at the time the policy issued, as to what the nature of the occupancy was, and was fully informed of the situation of the premises; and that the occupancy was substantially the same when the fire occurred as when the policy was issued. Upon this question the court instructed the jury:

"Now, if you find, under the evidence and instructions of the court, that this barn was insured as upon a farm leased to a tenant who lived off of and away from the farm, and upon another farm, and if you further find that the use and occupation of the premises by the tenant until he quit the place was such as is usual in such cases,—a substantial use and occupation, under such circumstances, such as the policy contemplated,—and if you

further find that King, as the agent of the plaintiff, and by his authority, soon after the tenant quit, and before the fire, took charge of the premises, and used and occupied the premises substantially as contemplated by the policy, had the tenant continued on as such tenant to and including the time of the burning of the barn, * * * I charge you that the policy is not void by reason of any vacancy or failure to occupy; but if, in such case, the care and vigilance on King's part was less, in any measurable degree, than would be incident to the use of the premises for the purposes intended under the policy, this would render the policy void. The plaintiff may, under such a policy as this, as well use and occupy the premises by himself or by his agent as by a tenant; and, in each case, the use and occupation need be no more, and cannot be measurably less, in either care or vigilance, than is incident to the purposes for which the insured property was intended under the policy."

I see no error in this charge, under the circumstances of the issuing of this policy. The policy itself is silent upon the question as to whether this barn was occupied at the time. The application was a verbal one, and Marsh (the agent) was fully cognizant of the situation and surroundings there. He knew that Strayer did not live on the premises, as well as the uses to which he put the barn, and there is nothing in the case making it apparent that the risk was increased or made more hazardous by being put under the care and supervision of King than it would have been under the care of Strayer; and the court, in another part of the charge, very properly told the jury that if the agent (Marsh) issued the policy knowing these facts, without further question as to the occupancy or the use of the premises, then the only use and occupation which the defendant can insist on, under the policy, is such as is usual and customary of such a farm and barn as this, by a tenant who does not reside upon, but away from, the farm.

It is true that "occupying" means "using;" but the

occupation of a barn means a very different use than that of a house, or any outbuilding. If the policy had been upon a house occupied by a tenant, then the vacancy would occur by the removal of the tenant, unless some other moved in and continued to occupy; but here the agent understood the use to which the barn was put, and where the tenant resided, and the degree of care and supervision that was then being applied to it, and how its use was to be continued. The dwelling there, he knew, was not fit for habitation, and it was not anticipated or expected that anyone would live there, on the farm, or that any oversight should be given the barn, except such as a tenant on another farm, going there occasionally, might give. It was as much occupied when King took control of it as when Strayer had it, during those portions of the year after he had removed his grain.

The intent of the parties in respect to occupancy is to be gathered from the usual and ordinary use of the premises for the purposes to which they are devoted. Wood, Fire Ins. 181; *Whitney v. Ins. Co.*, 9 Hun, 37.

The court was not in error in permitting proofs of the situation and surroundings at the time the policy issued, or of the arrangement made by plaintiff with Marsh, and what was said by him.

Some question is raised, under the assignments of error, upon the ruling of the court in the admission of testimony, which we do not deem of sufficient importance to discuss.

The trial was a fair one, and the judgment must be affirmed, with costs.

The other Justices concurred.